## NEWPORT COUNTY.

---

THE TOWN OF MIDDLETOWN *vs.* THE NEWPORT HOSPITAL.

The proprietors of the town of M. in A. D. 1744 voted to relinquish to the town all their rights in the common land lying on S. beach "to be by the said town managed from time to time as an estate belonging to said town." The town accepted the grant and the next

year voted in town meeting to sell the beach to E. in case E. would "allow all such privileges as shall be thought necessary for the service of the town by a committee," which was appointed, and in case of sale the committee was "to reserve the privileges by bond to be recorded with the deed, . . . and the town clerk to give the deed." The sale was made and the deed to E. referred to the town's vote. Coincident with the deed E. executed to one G., the town treasurer, his bond, which recited the town's vote, referred to the deed, and was conditioned on E., his heirs, executors, administrators, and assigns, granting and allowing forever to the inhabitants of the town certain liberties and privileges enumerated, being rights of entry and passage and of collecting and asporting sand, seaweed, shells, and drift stuff. All this was of record in the town. The privileges, after continuous enjoyment from A. D. 1746, were in A. D. 1877 interrupted by the successor in title of E., and the town of M. filed its bill in equity to establish the "liberties and privileges" against E.'s successor in title.

*Held*, that relief could not be given by reformation of the bond; it not appearing that the bond was other than the contracting parties intended, the heirs of the obligor not being parties to the suit, and equity courts not having jurisdiction to reform an instrument because the contracting parties misconceived its efficiency.

*Held*, further, that the bond was the personal contract of E. and was an essential part of his title, that notice of the bond was in the line of title of all E.'s successors in title, who were therefore affected with notice of it, and that all E.'s successors in title with notice of the bond were bound by its provisions.

*Held*, further, that the court could grant relief by injunction. *Keppell* v. *Bailey*, 2 Myl. & K. 517 ; *Brewer* v. *Marshall & Cheeseman*, 18 N. J. Eq. 337, 19 N. J. Eq. 537, disapproved.

*Held*, further, that the mere lapse of time since the bond was executed was no bar to relief; as the statute of limitation could only run from the time of interruption and no *laches* were found.

*Held*, further, that the bond was to secure performance, not to give an option of performance or breach.

*Held*, further, that the town could maintain its suit in equity without having letters administrative on G.'s estate taken out and suit brought in the name of the administrator.

*Held*, further, that the bond only allowed the material asported by the inhabitants of the town to be used in the town. Such material could not be exported from the town for use or sale beyond the town limits.

*Held*, further, that the complainant was entitled to an injunctive order preventing the respondent, E.'s successor in title, from interfering with the enjoyment by the inhabitants of the town of M. of the liberties and privileges described in the bond; and requiring the respondent to allow the inhabitants of the town of M. the rights and privileges secured by the bond, just as E. if living could have been required to allow them.

BILL IN EQUITY to establish *jura in fundo alieno*.

This bill was filed after the decision rendered in *Newport Hospital* v. *Carter*, 15 R. I. 285. The case was heard on bill, answer, and proofs. The facts involved and the pleadings are sufficiently stated in the opinion of the court. The instruments of title referred to by the court are as follows from the records of the complainant town :

*Proprietors' Records*, p. 99, February 26, 1744.

" The matter relating to Sechewest beach was debated in this meeting, and it was unanimously agreed by the proprietors to re-

linquish up to the town of Middletown, all their rights and title in the common land lying on Sachewest beach, to be by the said town managed from time to time forever hereafter, as an estate belonging to said town."

.   .   .   .   .   .   .   .   .   .   .   .   .

           " EDW'D EASTON,
                " *Proprietors' Clerk.*"

*Town Meeting Records, Book No.* 1, p. 15, May 8, 1745.

".Voted, that the town accept of the common land lying on Sechewest Beach, according to the grant of the proprietors, at their last proprietors meeting, held February 26, 1744."

*Town Meeting Records, Book No.* 1, p. 20, April 16, 1746.

" Voted, that Sechewest Beach be sold to Jonathan Easton, for two hundred pounds, in case he will allow all such privileges as shall be thought necessary for the service of the town by a committee hereafter chosen, and likewise pay all the rents now behind since the devision of the town, and pay all the charge created aboute said beach, since the devision. And that John Allen, John Clarke, Peleg Slocum, Thomas Gould and Peleg Roggers be, and they are hereby appointed a committee, they or the major part of them, to sell the same, and in case they sell the same, they are to reserve the privileges by bond to be recorded with the deed, and they to put the money into the town treasury, and the town ,clerke to give the deed, and they to make report of their doing to the next town meeting."

Thereafter the following deed was made and delivered to Jonathan Easton, and is recorded in the real estate records of the complainant town in Book 1, page 76 *sq.* :

" To all people to whom these presents shall come : I, Edward Easton, of Middletown, in the County of Newport, in the Colony of Rhode Island and Providence Plantations, in New England, Yeoman, (Town Clerk of Middletown aforesaid) send greeting : Whereas, at a Town Meeting held in Middletown aforesaid, the sixteenth day of April last past, it was voted that Sechewest Beach be sold to Jonathan Easton, and the Town Clerk to give the deed, as in and by the said vote of the said Town Meeting ; Relation being thereunto had may more fully and at large ap-

pear.  Now know ye, that I, the said Edward Easton, Town
Clerk, for and in consideration of the sum of two hundred and
thirty seven pounds, eighteen shillings, current money of the
Colony aforesaid, Old Tenor, to me in hand paid at or before the
sealing and delivery hereof by Jonathan Easton, of Newport, in
the County and Colony aforesaid, merchant, the Recept whereof
I do hereby acknowledge, and thereof do acquit and forever dis-
charge the said Jonathan Easton, his Heirs, Executors, Adminis-
trators and Assigns, by these presents Have granted, bargained,
sold, aliened, enfeoffed, conveyed and confirmed, And by these
presents (and by Virtue of the said recited Vote of the Town
meeting aforesaid) Do grant, bargain, sell, alien, enfeoff, convey
and confirm unto the said Jonathan Easton, his Heirs and As-
signs, A certain Beach, called and known by the name of Seche-
west Beach, Scituate, lying and being in Middletown aforesaid,
containing by Estimation Eighty Acres, be the same more or less,
and is bounded as followeth, Viz: Southerly on the sea or Ocean;
Westerly on land of the said Jonathan Easton; Northerly partly
on Land of James Honyman, Jr., and partly on Land of the said
Jonathan Easton; and Easterly on Land of the said Jonathan
Easton; Together, also, with all and Singular Ways, Rights, Lib-
erties, privileges and Appurtainances whatsoever to the same be-
longing or in any wise appertaining.  To have and to hold said
Beach hereby granted, with the Appurtenances, unto the said
Jonathan Easton, his Heirs and Assigns, To the only proper use
and behoof of the said Jonathan Easton, his Heirs and Assigns,
forever.  And I, the said Edward Easton, Town Clerk, for my-
self and my Successors in said Office do covenant, promise and
grant to and with the said Jonathan Easton, his Heirs and As-
signs, by these presents, in manner following (That is to say):
That I, the said Edward Easton, Town Clerk, now, at the time
of the sealing and delivery hereof (by virtue of the afore Recited
Vote of the Town Meeting), have in myself good right, full power,
lawfull and absolute authority, to grant, bargain and sell the said
Beach, Hereditament and premises hereby granted, with the Ap-
purtainances, unto the said Jonathan Easton, his Heirs and As-
signs, in manner and form as aforesaid.  And that the said Jona-
than Easton, his Heirs and Assigns, shall or lawfully may from

time to time, and at all times forever hereafter, Quiately and peaceably Have, Hold, use, Occupy, Possess and Enjoy the said Beach, Hereditaments and premises hereby granted, with the Appurtainances, Free and Clear, and Freely and Clearly Clearly acquited, exonorated, and forever Discharged of and from all and all manner of former and other Gifts, Grants, Bargains, Sales, Leases, mortgages, Joyntures, Dowries, Wills, Entails, Fines, amerciments, Judgements, Executions, Extants, Titles, Charges, Troubles, Claims and Demands, Burthens and Incumbrances whatsoever. Furthermore, I, the said Edward Easton, for myself and my Successors in said Office of Town Clerk, the said Beach, Hereditament and premises, hereby granted, with the Appurtainances unto the said Jonathan Easton, his Heirs and Assigns, against me, the said Edward Easton, and my successors in said Office, and against all and every other person and persons whatsoever belonging to Middletown, shall and will warrant and forever defend by these presents.

" In Witness whereof, I, the said Edward Easton, Town Clerk, have hereunto set my Hand and seal, the nineteenth day of May, in the nineteenth year of His Majesty's Reign, George the Second, King of Great Britain, &c., Anno ye Domini one thousand seven hundred and forty six.

"EDWARD EASTON, <em>Town Clerk.</em>    [L. S.]

" Signed, sealed and deliv<sup>ed</sup>
     In the presents of
 " WILLIAM TURNER. ·
 " SARAH TURNER.

> MIDDLETOWN, ss: May 19th, 1746.
>
> Edward Easton, Subscriber to the above Instrument, personally appeared and acknowledged the same to be his Act and Deed, hand and Seal thereto set.
>
> Before WILLIAM TURNER, Just. of peace.

" Recorded May 19th, 1746,
     Pr. EDW'D EASTON,
         *Town Clerk.*

" To Edward Easton, Town Clerk of Middletown : We whose names are underwritten, being Chosen a Committee at a Town

Meeting held in said Middletown the 16th of April, 1746, to sell Sechewest Beach to Jonathan Easton, and according to said vote we have sold the same.

"Dated May 12th, 1746.                "JOHN ALLEN.
                                      "PELEG SLOCUM.
                                      "THOS. GOULD."

And thereupon, the said Jonathan Easton made and delivered to the said Edward Easton, town clerk of the complainant town, the following bond, which is recorded in the real estate records of the complainant town in Book 1, p. 78 *sq.*:

"Know all Men by these presents: That I, Jonathan Easton, of Newport, in the County of Newport, in the Colony of Rhode Island and Providence Plantations in New England, Merchant, am held and firmly bound unto Thomas Gould, of Middletown in the County and Colony aforesaid, Esq$^r$., (Treasurer of the Town of Middletown aforesaid,) in the full and just sum of Two Thousand pounds, Current money of the Colony aforesaid, Old Tenor, to be paid to the said Thomas Gould in his capacity aforesaid, or to his successors in said Office: To which payment well and truly to be made, I bind myself, my Heirs, Executors, Administrators and every of them, firmly by these presents, Sealed with my Seal, Dated the nineteenth day of May, Anno Dom$^i$ One Thousand Seven Hundred and Forty Six —

"Whereas, at a Town Meeting held in Middletown, the sixteenth day of April last past, 'Voted that Sechewest Beach be sold to Jonathan Easton, for Two hundred pounds, In case he will allow all such Privileges as shall be Thought necessary for the Service of the Town by a Committee hereafter chosen: and likewise pay all the Rents now behind since the Devision of the Town, and pay all the charge created aboute said Beach since the Devision. And that John Allen, John Clarke, Peleg Slocum, Thomas Gould and Peleg Roggers be, and They are hereby appointed a Committee, they, or the Major part of them, to Sell the same, and in Case they Sell the same, they are to Reserve the privileges by Bond to be Recorded with the Deed, and They to put the money into the Town Treasury, and the Town Clerk to give the Deed,' As in and by the said recited Vote of the Town Meeting aforesaid, Relation being thereunto had may more fully and at large

appear.   And whereas, in and by a Certain Deed under the Hand
and Seal of Edward Easton, of Middletown aforesaid, Yeoman,
(Town Clerk of Middletown aforesaid,) duly executed, bearing
even Date with these presents : He the said Edward Easton, for
the consideration therein mentioned, Did grant and Convey unto
the s$^d$ Jonathan Easton, his Heirs and Assigns, A certain Beach,
called and known by the Name of Sechewest Beach, Scituate,
lying and being in Middletown aforesaid, and is bounded as fol-
lows : Viz. : Southerly on the Sea or Ocean, Westerly on Land
of the s$^d$ Jonathan Easton, Northerly partly on Land of James
Honyman, Jun., and partly on Land of the said Jonathan Easton,
and Easterly on land of the said Jonathan Easton, Together with
the Appurtainances.

"To hold to him the said Jonathan Easton, his Heirs and As-
signs forever, As in and by the said Recited Deed, Relation being
thereunto had may more fully and at large appear.   Now, the
Conditions of this present Obligation is Such, That if the said
Jonathan Easton, his Heirs, Executors, Administrators and As-
signs, do and Shall grant and allow unto the Inhabitants of the
Town of Middletown aforesaid, forever, The following Liberties
and privileges out of the above mentioned and described Beach,
(That is Say,) A Conveniant Drift way to pass and Repass from
the end of the Lane near the place called the Falls, across Across
that called his, the said Jonathan Eastons Ten Acre Lott, down to
the Commonage Sold to him.   And that there shall be a good
large Gate or Gates, always kept in good Repair, where it now
stands, fit for Carts and Horses to pass through, and that the Sur-
veyors of the Highways shall have Liberty at any time to mend
the said Drift way, also a Conveniant Drift way over the said
Commonage Sold to him, To the Eastermost part thereof untill it
comes to that called Anna Bennetts Lott, and then to go over or
across any part of the Southermost part of the said Anna Bennetts
Lot ; Together with a Conveniant Drift way down to the Landing
place, with Sufficient Room along the North Shore to Land wood,
Rails, or what Else any of the Inhabitants aforesaid may have Oc-
casion to Land, with Liberty to Transport it from thence at any
time.   And y$^t$ there Shall be a Conveniant Drift Way to pass and
Repass into Sechewest Neck, along said Beach or Commonage, and

so to the Northwestermost part of Henry Tews Land.  Likewise that any of the Inhabitants aforesaid shall have full and free Liberty of going to and from the said Beach or Commonage, or any part thereof, without mollestation, either on Horse back or on foot, likewise with Carts and Teems of Oxen or Horses, to fetch and carry away from the said Beach or Commonage, Sand, Seeweed and Shells, and all Such Drift Stuff as any of the Inhabitants aforesaid Shall take up in the Surff, or under High Water Mark, against said Commonage or Beach.  And that They shall have the Liberty to lay Seeweed and Shells in heaps on any part of the said Commonage and to carry off the same, as it suits their Conveniancy: Then this present Obligation to be Void and of none effect, otherwise to be and Remain in full force and Virtue.

                                   " JONATHAN EASTON.    [L. S.]

" Sealed and Delivered
    In the presence of
" GILES SLOCUM, JUN.
" WM. TURNER.

" Recorded, May 24, 1746.
    Pr. EDW'D EASTON,
            *T. Clerk.*

MIDDLETOWN, SS., May 19th, 1746. Jonathan Easton, Subscriber to the above Instrument, personally appeared and acknowledged the Execution of the Same to be his act and Deed, hand and Seal hereunto set.
    Before WM. TURNER, Just. of the peace."

*Newport, September* 25, 1888.  DURFEE, C. J.  The subject of this controversy is a claim of right on the part of the complainant, the town of Middletown, for itself or its inhabitants, to enjoy certain liberties and privileges in Sachuest Beach, so called, being a tract of land lying in said town, containing about eighty acres, now in the possession of the defendant, the Newport Hospital, under a claim of absolute ownership in fee simple.  The case set forth in the bill may be briefly stated as follows, to wit: The title to Sachuest Beach was formerly in the town under a vote of " the proprietors," passed February 26, 1744,[1] whereby the proprietors

---

[1] This date is old style.

unanimously agreed to relinquish to the town " all their rights and title in the common land lying on Sachuest Beach, to be by the said town managed from time to time forever hereafter, as an estate belonging to said town," the town having accepted the grant by vote, May 8, 1745.[1]  On the 16th April, 1746,[1] the town voted to sell the beach for two hundred pounds to Jonathan Easton, " in case he will allow all such privileges as shall be thought necessary for the service of the town by a committee hereafter chosen."  The town by the same vote appointed certain persons named as a committee, they, or the major part of them, to sell the beach, and, in case of sale, " to reserve the privileges by bond to be recorded with the deed," the money to be put in the town treasury, the town clerk to give the deed, and the committee to make report of their doing to the next town meeting. The sale was effected, a deed given and bond taken.  The deed, premising the vote of the town, was made by Edward Easton, town clerk, under the signature and seal of Edward Easton, town clerk.  In a former cause the sufficiency of the execution was questioned ; but for the purposes of this suit it must be assumed ; since the complainant cannot consistently, at the same time, claim under the bond and repudiate the deed.  The deed, which is a deed poll, purports to convey the beach to Jonathan Easton, his heirs and assigns, absolutely, with unlimited warranty of title, without any express mention of the bond.  The bond, given by Jonathan Easton, grantee under the deed, to Thomas Gould, treasurer of the town of Middletown, bears date of the same day as the deed, to wit, May 19, 1746,[1] and purports to bind said Jonathan Easton, his heirs, executors, and administrators, to pay to said Gould, in his capacity of treasurer, or to his successors in office, the sum of two thousand pounds, current money of the colony, old tenor, subject to a condition, however, by virtue of which it is to be void, if the obligor, his heirs, executors, administrators, and assigns do and shall " grant and allow " unto the inhabitants of the town forever the liberties and privileges specified in said condition, the same being a liberty on the part of the inhabitants to go to and from said beach, on foot or horseback, likewise with carts and teams, to fetch and carry away sand, sea-

---

[1] These dates are all old style.

weed, and shells, and all such drift stuff as any of them may take up in the surf or under high water-mark, together with the liberty of laying seaweed and shells in heaps for the purpose of carrying them away at their convenience, and incidental rights or liberties of access, all of the same being also the liberties and privileges involved in this suit. The bond contains a recital of the vote of the town and of the conveyance of the beach by Edward Easton, town clerk. The deed and bond were both acknowledged and recorded.

On the death of Jonathan Easton all his realty, including the beach, passed by devise to his son Nicholas, who died intestate A. D. 1812. Subsequently, whatever title to the beach passed by devise to said Nicholas became vested in the late John Alfred Hazard, a descendant of said Nicholas, who at his death, A. D. 1880, devised it to the defendant. The bill sets forth that the beach came to said Hazard " by testamentary provisions by the heirs of Nicholas, and by deeds of conveyance between them and by partition between them." The answer sets up that eleven twenty thirds of the beach came not directly from the heirs, but through *bonâ fide* purchasers without notice. The bill also shows that from May 19, 1746, the day the deed and bond were executed, to the year 1877, a period of one hundred and thirty years, the inhabitants of the complainant town have exercised and enjoyed the liberties and privileges freely and without molestation ; but that in 1877 said Hazard, pretending that the bond was void, brought certain suits in trespass against some of the inhabitants for " asporting seaweed and sand from the said beach," and that since his death the defendant, making the same pretences, has brought like suits and threatens to bring suits against any person resident in Middletown who takes sand and seaweed from said beach.

The specific prayer for relief is that the bond may be reformed so as to answer the plain intentions of the parties thereto, and the provisions of the vote of April, 1746; that the beach may, in the possession of the defendant and its successors and assigns, be made subject to all the liberties and privileges specified in the bond, and that the same may be decreed to belong to and to be vested in the town of Middletown, pursuant to the vote of April

16, 1746, and that the defendant, its successors and assigns, may hold said beach subject to said liberties and privileges, decreed to belong to and to be vested in the complainant, the town of Middletown.   The bill also contains a prayer for general relief.

The bill does not set forth, and the brief of the complainant's counsel does not indicate the changes which the complainant supposes are necessary to bring the bond into correspondence with the intention of the parties and the provisions of the vote.   We presume that to-day, under a similar vote, the bond would be taken directly to the town itself; but the vote did not expressly provide that the bond should be so taken, and we see no reason to doubt that it was taken to the town treasurer advisedly as the proper mode of taking it.   The vote, construed literally, seems to import that the privileges were to be secured for the town instead of the inhabitants; but considering what small use the town as such could have for privileges in Sachuest Beach, we have little doubt that the contemporaneous construction was the correct one.   If we look to the prayer of the bill to learn what changes in the bond are desired, we infer, though we find no specification, that the complainant desires to have the bond so altered that it will become operative as a grant to the town, vesting in the town the privileges mentioned for the use of the inhabitants.   We know of no mode in which this could be effected without making the bond more, or something else, than a bond, by adding to or embodying in it a reconveyance, and the vote of the town does not indicate to our minds an intent to have the privileges reconveyed, but only to have them allowed, and *reserved* by bond, meaning *secured* by bond.   The vote was so construed by the committee, and, for anything that appears, their construction was approved by the town. Indeed, it would have been an extraordinary thing for the town to require Jonathan Easton to reconvey the privileges, and, at the same time, to secure their peaceful enjoyment under a heavy penalty.   But, moreover, the only ground on which a court of equity is authorized to reform a deed or contract is that, by reason of some mutual mistake, it is different from what the parties intended to have it.   In this case no such mistake is alleged. The bond, for anything that appears, was drawn precisely as the parties intended to have it drawn.   It appears from the bill that

for more than one hundred and thirty years it completely answered the purposes for which it was taken, and if it has become less effectual now, this does not show that it was not originally drawn according to the intent of the parties, but only that the town or its committee misconceived its efficiency. Courts of equity have no jurisdiction to reform contracts on account of such misconceptions. Indeed, after the lapse of so long a time without dissent, and especially after changes of title by purchasers without any notice of ·dissatisfaction with the bond, the court would be slow to reform it even upon such a showing as, if seasonably made, would have been satisfactory. We may add that we do not appear to have the necessary parties before us, the heirs of the obligor being as necessary as the defendant, if the bond were to be reformed.

The complainant, if entitled to any relief in equity, can have it only under the prayer for general relief, and under the bond as it exists. The counsel for the defendant argues that the bond cannot be treated either as a condition of the grant or as a reservation out of it. We think his argument is sound. Indeed, we do not understand that the complainant makes any contest on either point. He also contends that the bond is not a covenant running with the land. We think he is right in this contention. It has been decided in England that the grantee of an estate in fee simple cannot charge the estate by covenant running with it, since such a covenant can exist only when there is some privity of title or tenure between the covenantor and covenantee, and since the old statute of 18 Edward I. cap. 1, called the statute of *Quia Emptores*, passed A. D. 1290, no such privity exists between the grantor and grantee of an estate in fee simple. *Spencer's case*, 5 Rep. 16 ; 1 Smith's Lead. Cas. 137, and notes ; *Randall* v. *Rigby*, 4 M. & W. 130 ; *Inhabitants of Plymouth* v. *Carver*, 16 Pick. 183. In the case at bar there was no privity, even if we were to suppose that the statute of *Quia Emptores* is not a part of our law ; for, considering the bond as a covenant, the obligee must be considered to be the covenantee, and the obligee here was Thomas Gould, an entire stranger to the estate. The complainant cannot be regarded as the obligee at law, however it may be regarded in equity ; and a covenant cannot run with the land, in the technical meaning of the word, unless it can run with it at law.

The bond is, in our opinion, simply the personal contract or obligation of the obligor, and must be dealt with accordingly.   In equity the remedy on it, if any, must be in the nature of a remedy by specific performance, either positively by decree to perform, or negatively by injunction to refrain from violating.

The bill does not make a case for specific performance in the first form ; for though the condition of the bond was that the obligor, his heirs and assigns, should " grant and allow " the privileges to the inhabitants *forever*, we think it is evident that the word " grant " was not used technically to signify a conveyance to be subsequently executed by the obligor, but popularly to signify a continuous exercise of concession and allowance, or, in other words, a perpetual license, guarantied by the penalty, under which the inhabitants were to exercise and enjoy the liberties and privileges mentioned.

The question is, can the court grant relief by injunction.   It is settled that a contract can be enforced by injunction, when that is an appropriate remedy, and it is also settled that contracts concerning real estate, creating or securing a charge or restriction upon it, can be so enforced not only between the immediate parties, but also against their heirs, devisees, voluntary grantees, and their vendees with notice, even when the contracts are not technically covenants running with the land.   3 Pomeroy Equity Juris. §§ 1341, 1342.   " The language of courts and of judges," say the court in *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440, 450, " has been very uniform and very decided . . . that whoever purchases lands upon which the owner has imposed an easement of any kind, or created a charge which would be enforced in equity against him, takes the title subject to all easements, equities, and charges, however created, of which he has notice."   The defendant cites to the contrary the cases *Keppell* v. *Bailey*, 2 Myl. & K. 517, and *Brewer* v. *Marshall & Cheeseman*, 18 N. J. Eq. 337 ; 19 N. J. Eq. 537.   In *Keppell* v. *Bailey*, the owners of some iron works had joined with some other persons in forming a joint stock company to construct a railway for the purpose of connecting a lime quarry with the iron works and with other works, and with a canal, and in the partnership deed of the railway company there was a covenant by the owners of the iron works, for themselves,

their heirs, executors, administrators, and assigns, with the other shareholders, to procure all the limestone used in the iron works from the lime quarry, and to convey all the limestone, and also the iron-stone from their mines, to their works along the railway, and to pay a fixed toll; and it was held by Lord Brougham that this covenant did not run with the land, and was not binding at law upon a person who had purchased the iron works, and he was not bound in equity by reason of his having purchased with notice of the covenant. This decision, however, so far as it holds that a purchaser with notice is not bound in equity, where at least the covenants are restrictive simply, has been overruled. In *Luker* v. *Dennis*, L. R. 7 Ch. Div. 227, 236, the court, speaking of it, say : " I think it cannot be reconciled with the more recent cases, and it is more straightforward to say this than to attempt to draw refined distinctions. I think, therefore, that I am bound to give effect to the equitable doctrine of notice, notwithstanding *Keppell* v. *Bailey.*" In *Tulk* v. *Moxhay*, 2 Phillips, 774, the doctrine enounced was : " A covenant between vendor and purchaser, on the sale of land, that the purchaser and his assigns shall use or abstain from using the land in a particular way, will be enforced in equity against all subsequent purchasers with notice, independently of the question whether it be one which runs with the land so as to be binding on subsequent purchasers at law ; " and Lord Cottenham, in giving decision, said : " With respect to the observations of Lord Brougham in *Keppell* v. *Bailey*, he never could have meant to lay down that this court would not enforce an equity attached to land by the owner, unless under such circumstances as would maintain an action at law. If that be the result of his observation, I can only say that I cannot coincide with it." See, also, *Tulk* v. *Moxhay*, 11 Beav. 571. " The covenant," says Bigelow, J., in *Whitney* v. *Union Railway Co.* 11 Gray, 359, 364, is not binding on the purchaser merely because he stands as an assignee of the party who made the agreement, but because he has taken the estate with notice of a valid agreement concerning it, which he cannot equitably refuse to perform." See, also, *Wilson* v. *Hart*, 2 H. & M. 551 ; L. R. 1 Ch. App. 463 ; *Cooke* v. *Chilcott*, L. R. 3 Ch. Div. 694 ; 2 Pomeroy Equity Juris. § 689, n. 5 ; 2 Sugden on Vendors & Purchasers, bottom paging 596, note m ;

Waterman on Specific Performance, §§ 62, 75, 76 ; High on Injunctions, § 728. The decision of Lord Brougham in *Keppell* v. *Bailey* has been elaborately and unfavorably criticised by Lord St. Leonards in 2 Sugden on Vendors & Purchasers, Appendix No. 1.

The case of *Brewer* v. *Marshall & Cheeseman*, 18 N. J. Eq. 337, was decided on the authority of *Keppell* v. *Bailey*. The decision was affirmed on appeal, 19 N. J. Eq. 537, but the appellate court recognized the general doctrine to be as above stated, and based their affirmation on two grounds, namely : *first*, because to enforce the covenant would be to establish a principle in equity which would virtually overturn the doctrine at law that covenants as a general thing will not run as a burden upon land, and would enable grantors, by inserting the appropriate covenants in their deeds, and thereby making subsequent purchasers chargeable with notice, to encumber and embarrass the title by all sorts of charges and restrictions ; and *second*, because the covenant there sought to be enforced was illegal and void as against public policy. Similar relief was refused for similar reasons in *West Virginia Transportation Co.* v. *Ohio River Pipe Line Co.* 22 W. Va. 600; and in *Keppell* v. *Bailey*, the evils which might result from holding purchasers with notice bound by such covenants were strongly urged. But we find no other cases of restrictive covenants in which these supposed evils were allowed to have weight, except when the restrictions were regarded as illegal or against public policy, the general doctrine being that, if the covenant is enforcible between the immediate parties, it will be enforced against voluntary grantees or purchasers with notice.

In *Haywood* v. *Brunswick Building Society*, L. R. 8 Q. B. Div. 403, decided A. D. 1881, the Court of Queen's Bench held that the doctrine applies to restrictive covenants, that is, to covenants to use or not to use the land in a particular way, and possibly, also, to covenants creating equitable charges which can be enforced directly against the land, but does not extend to covenants which bind the covenantor to the expenditure of money or to the performance of other active duties requiring a mandatory order or injunction for enforcement. The doctrine thus qualified is certainly narrower than the statement of it which is contained in

many of the cases; but, even as thus qualified, we think it is not inapplicable to the case at bar, for here no active duty is required, unless it may be the incidental duty of maintaining· a gate, in regard to which there is no complaint, the entire duty otherwise being performed by not interfering with the inhabitants of the town in the exercise of the rights and liberties secured to them.

In the case at bar the contract was entered into one hundred and forty years ago.   We know of no case of enforcement so long after the making of the contract, or after such a succession of ownership by inheritance, devise, or purchase, but we are not advised of any reason why the remedy should be defeated solely thereby, where the contract stipulates for a continuous performance, and remains unbroken until shortly before suit.   The original equity in such a case cannot lose its binding force by mere lapse of time, there being no *laches,* nor by mere change of ownership, so long as the successive owners are volunteers or purchasers with notice.   And see *Mann* v. *Stevens,* 15 Sim. 377.

Nor do we think the defence of the statute of limitations or of *laches* can avail.   The statute could not begin to run before breach, and no breach is shown prior to A. D. 1877, and certainly since then no *laches* can be imputed.

The defendant contends that the bond gives the obligor an option either to perform the condition and avoid the penalty, or to refuse performance and incur the penalty, and that the court, therefore, will not interfere to 'compel performance.   If the purpose was to create an option the court must respect it; but in equity it is the purpose, not the form, which controls; and when courts find that the purpose was not to create an· option but to secure performance by means of the penalty, they will give the purpose effect.   *Howard* v. *Hopkyns,* 2 Atk. 371; *Chilliner* v. *Chilliner,* 2 Ves. 528; *Hardy* v. *Martin,* 1 Cox, 26; *Logan* v. *Wienholt,* 1 Cl. & Fin. 611; *Fox* v. *Scard,* 33 Beav. 327 ; *Connell* v. *Buckle,* 2 P. Wms. 242; *Ensign* v. *Kellogg,* 4 Pick. 1; *Plunkett et al.* v. *Methodist Episcopal Society in North Adams et al.* 3 Cush. 561; *Dooley* v. *Watson,* 1 Gray, 414; *Waynick* v. *Richmond,* 11 Kans. 488; *French* v. *Macale,* 2 Dr. & War. 269. Chief Justice Shaw, in delivering the opinion in *Dooley* v. *Watson,* remarked: " Courts of equity have long since overruled the doc-

trine that a bond for the payment of money, conditioned to be void on the conveyance of land, is to be treated as a mere agreement to pay money. When the penalty appears to be intended merely as a security for the performance of the agreement, the principal object of the parties will be carried out." Courts have allowed themselves much, sometimes perhaps too much, latitude of construction in this class of cases. But in the case at bar there is little room for doubt that the purpose of the penalty was security ; for the vote of the town, recited in the bond, authorizes the sale to Jonathan Easton only "in case he will allow all such privileges as shall be thought necessary for the service of the town," and expressly provides that the committee, if they sell, "are to *reserve* the privileges by bond to be recorded with the deed." Morever the penalty, if exacted for non-performance, would go to the town, whereas the condition is for the benefit of the inhabitants, and it has been held that in such a case it cannot be supposed that an option was intended. *Chilliner* v. *Chilliner*, 2 Ves. 528, 530 ; *Roper* v. *Bartholomew*, 12 Price, 797.

The defendant also contends that it ought not to be compelled to keep the condition because a part of its title came through *bonâ fide* purchasers for value without notice. We do not think this objection can avail ; for notice of the bond was in the line of its title, the title being in fact dependent on it ; since Edward Easton was not empowered to convey without the bond. *Le Neve* v. *Le Neve*, 2 White & Tudor Lead. Cas. Eq. 4th Amer. ed. pt. 1, p. 189. In the notes to the case cited the law is thus stated : "It is thoroughly well established that a purchaser will have constructive notice of everything which appears in the deed or instruments which prove and constitute the title, and is of such a nature that if brought directly to his knowledge would be actual notice. This is the more obvious because the right of a purchaser cannot go beyond his title, and whatever appears on the face of the title papers forms an integral part of the title itself." The purchaser of an interest in Sachuest Beach could not trace his title without coming to the vote of the town under which the beach was conveyed to Jonathan Easton, and there learning that authority to make the conveyance was dependent on said Easton's giving the bond.

The defendant also contends that the town cannot maintain the suit because it is not a party to the bond. The bond was taken in the name of Thomas Gould, treasurer of the town of Middletown, but evidently for the benefit of the town. Doubtless the town, in order to sue upon the bond at law, would be obliged to have administration taken out on the estate of Thomas Gould and sue in the name of the administrator; but it seems to us that to require it to do so in equity at this late day would be to require the observance of a mere technicality which can be dispensed with without the possibility of harm to anybody. We do not think the suit should be dismissed on such a ground.

It is further objected that the condition of the bond ought not to be enforced because it is repugnant to the grant, since it allows the inhabitants of Middletown to take and carry away sand and gravel from the beach without stint, the effect of which in time will be to destroy the beach or to remit it to the sea. We do not think the objection is tenable. The right, as we construe it, is not without stint; for, being reserved to the inhabitants of the town, we think it must be construed as exercisable for use by them in the town and not elsewhere. An inhabitant of the town cannot be permitted to cart away the sand or gravel for use or sale in Newport, or in any town but Middletown. The case resembles *Green* v. *Putnam*, 8 Cush. 21. In that case it was held that a vote by the Proprietors of Worcester, in 1733, recorded in their record, " that one hundred acres of the poorest land on Milestone Hill be left common for the use of the town for building stones," constituted a grant of the quarry to the town, not for their use in a corporate capacity, but for the use and benefit of those only who were or might become inhabitants thereof, for all purposes for which such materials, in the progress of time and the arts, might be made useful; and that the use of the stone for building purposes, without the limits of Worcester, by inhabitants of other towns was a violation of the grant, and so far as the defendant, who was an inhabitant of Worcester, had procured stone for such purposes, he was liable for so doing. See, also, *Inhabitants of Worcester* v. *Green*, 2 Pick. 425, and *Hall* v. *Lawrence*, 2 R. I. 218.

Doubtless the beach might have been conveyed to Jonathan Easton, subject to a condition that he would allow to the inhab-

itants of Middletown the rights and liberties mentioned in the bond; in which case the rights and liberties, if not allowed, could have been secured by a forfeiture of the estate. It seems to us that the bond, if possible, should be made as effectual. As we have seen, the beach came to the town under a vote of the proprietors to relinquish " all their rights and title in the common land on Sachuest Beach, to be by said town managed from time to time *forever*, hereafter, *as an estate belonging to said town.*" The town, having accepted the grant, ought, acting in good faith, to have kept the beach; and, doubtless, it intended, when it sold the beach, to carry out the purpose of the proprietors by requiring the bond. The bond was an essential part of the transaction by which the beach passed to Jonathan Easton and entered into the very texture of his title. We think it is not probable but that this character of the title has been understood, as it has been until quite recently duly regarded, by the subsequent holders. It seems to us to be just and equitable in the highest degree that the defendant, the present owner, should be required to allow the inhabitants of Middletown the rights and privileges secured by the bond in the same manner as Jonathan Easton could himself be required to allow them if still living, and we will enter a decree against the defendant accordingly.               *Decree accordingly.*

*Arnold Green & Samuel R. Honey*, for complainant.

*William P. Sheffield & Francis B. Peckham*, for respondent.