KETTLE RIVER RAILROAD COMPANY *vs.* EASTERN RAILWAY COMPANY OF MINNESOTA and others.

October 4, 1889.

| 41 | 461 |
|---|---|
| 42 | 367 |
| 43 | 530 |
| 41 | 461 |
| 44 | 203 |
| 41 | 461 |
| s 6 LRA | 111 |
| 52 LRA | 649 |

**Railway — Contract for Exclusive Right of Way held Illegal.**—An agreement which, by its terms, gives the exclusive right of way to a railway corporation in or through a certain tract of land, in so far as it attempts to exclude other railway corporations from acquiring a right of way over the same tract, upon land not appropriated or required for its use by the covenantee, is against public policy, and void.

**Same—Eminent Domain—Who may Question Power to Condemn.**— A third party, not interested in lands taken for a right of way by a railway company, cannot raise the objection that the corporation has no power under its charter to acquire the specific lands for railway purposes.

**Same—Criterion of Whether Use is Public.**—Where land is taken for its use by a railway corporation having the right to exercise the power of eminent domain, the question whether the use is public or private depends upon the right of the public to use the road and to require the corporation, as a common carrier, to transport freight or passengers over the same, and not upon the amount of business.

**Same—Covenant by Quarry-Owner held not to run with Land.**—A covenant by a land-owner, by which he agrees that the products of a stone-quarry shall be transported to market exclusively over one line of railroad, is not a covenant real, and does not run with the land.

**Vendor and Purchaser—Inquiry as to Title—What Covenants bind Purchaser with Notice.**—A purchaser is bound to inquire into the title of his vendor, and is affected with notice of any equities which ap-

pear upon the same. And, in equity, covenants relating to land or its mode of use or enjoyment are frequently enforced against grantees with notice, though there is no privity of estate, and they are not such as, in strict legal contemplation, run with the land. But they must be such as relate to or concern the land or its use. It is not enough that a covenant affects the use of the land or its mode of enjoyment in a collateral way.

**Same—Purchaser not bound by Quarry-Owner's Covenant with Railway Co.**—The class of covenants falling within the equity rule considered, and *held* not to include an agreement for the exclusive transportation of the products of land by a railway company extended to or built over it.

Appeal by defendants from an order of the district court for Pine County, *McCluer*, J., presiding, refusing to dissolve an injunction.

*Lusk & Bunn* and *Geo. L. Bunn*, for appellants.

*James Smith, Jr.*, *W. A. Barr*, and *Julien T. Davies*, for respondent.

VANDERBURGH, J.   The plaintiff was incorporated under the general laws in 1886, and, as is alleged, possesses the usual powers and franchises of railway corporations, and is authorized to build and operate a railway, with one or more tracks, from a point on the line of the St. Paul & Duluth Railroad in the county of Pine, in township 42 north of range 20, extending thence to a point on the right bank of Kettle river, in the same township, with extensions to reach any or all industries that are or may be hereafter established in said township, and localities adjoining the same, with all necessary and convenient tracks, side tracks, or track extensions, grounds, etc., and with the right to locate a branch southerly to another point on Kettle river, and another to the east line of the state, with all necessary side tracks, etc.; it being the declared purpose of the company to operate such line or lines in connection with the St. Paul & Duluth Railroad. Prior to the incorporation of the plaintiff, the Kettle River Sandstone Company had been incorporated, and had become possessed of the title in fee to the lands in township 42, which are particularly described in the complaint, and upon which are large and valuable deposits of merchantable sandstone, which, it is alleged, could not be quarried and transported to market without the construction of a railroad to reach the same; and thereupon negotiations for such purpose

were entered into between the plaintiff and the sandstone company, which finally resulted in the execution by them of the following indenture, with mutual covenants, and which forms the basis of this action:

"This indenture, made and concluded this first day of November, 1887, by and between the Kettle River Sandstone Company, a corporation existing in the state of Minnesota, party of the first part, and the Kettle River Railroad Company, also a corporation existing in said state, party of the second part, witnesseth:

"That whereas, the first party is the owner in fee-simple of the following real estate situate in the county of Pine and state of Minnesota, described as follows, to wit: The south-west quarter, and the south half of the north-west quarter, and the south-west quarter of the north-east quarter, and the north-west quarter of the south-east quarter, of section three, (3;) also the east half of the north-west quarter, and the east half of the south-west quarter, and the west half of the south-east quarter, and the south-east quarter of the north-east quarter, of section ten, (10;) and the north-west quarter of the north-east quarter, and the north-west quarter of the south-east quarter, and the west half of the south-west quarter, and the north-east quarter of the south-west quarter, and so much of the east half of the north-west quarter of section fifteen (15) as is not included or embraced in the town-site of Sandstone, as the same is surveyed and platted, and the plat thereof recorded in the office of the register of deeds of Pine county,—all in township forty-two (42) north, of range (20) west, according to the government survey thereof; upon which premises the said second party has, for the purpose of affording railroad facilities for the said first party, constructed its line of railroad, extending from a point of junction with the main line of the St. Paul & Duluth Railroad Company, in section eighteen, (18,) in said township and range, in said county of Pine, to a point on or near the right bank of Kettle river, in said section ten, (10,) town and range aforesaid, with side tracks and other railroad structures in and upon the premises of the said first party, above described, so as to afford facilities for the transportation of sandstone from the quarries of said first party now opened: And whereas, the principal

value of the lands and premises of the said first party hereto consists of large and valuable deposits of marketable sandstone, and it is desirable for the said first party to secure the present and additional facilities to transport its marketable stone from said quarries, and other points of said premises, by having the second party extend its tracks and other connections from time to time, as hereinafter specifically provided, as such quarries may be opened and worked upon said real estate; and in consideration thereof, and to secure the said second party the right of way, and the right of transporting all of the said stone over its said line of railroad and extensions, upon the payment to said second party, its lessees, successors, and assigns, of a reasonable compensation for transporting the same:

"Now, therefore, the said first party, in consideration of the premises aforesaid, and of one dollar to it paid by the said second party, the receipt whereof is hereby acknowledged, does, by these presents, grant, bargain, sell, and convey to said second party, its successors, lessees, and assigns, forever, so much of said real estate and premises as may be necessary and convenient for the maintenance and operation of its line of railroad as the same is now constructed, or as the said second party may hereafter, from time to time, desire to relocate and construct the same, with all the necessary or convenient buildings, depots, engine-houses, water-tanks, turn-tables, and other structures, with all necessary and convenient turn-outs, yards, and side tracks; and also to construct thereon, and forever maintain and operate, a line of railroad from some convenient point on its said main line, to be selected by said second party, running thence to a point on the west bank of Kettle river, in said section ten, (10,) with all such portions of said real estate as said second party, or its successors and assigns, may require for additional tracks, side tracks, depots, and standing ground, and other structures, at such points and localities as said second party or its successors may from time to time select or designate. And also grants to said second party, its successors or assigns, the exclusive right of way, for railroad purposes, of such reasonable width as said second party may from time to time require and designate, so as to extend, operate, and use the same so as to reach all stone-quarries that may hereafter be opened or worked

at any point, place, or locality within the limits of the real estate hereinbefore first described, and to connect such track or tracks with the tracks now or hereafter to be constructed by said first party, with the right also to bridge Kettle river at such points or places as may be designated by said second party from time to time, in order to reach the quarries that may be opened on the easterly side of said river:

"To have and to hold the above-granted premises, rights, and privileges to the said second party, its successors and assigns, forever; subject, however, to the right of the said first party, its successors, its lessees, and assigns, to quarry and remove the stone from said premises for transportation as aforesaid; and for that purpose the tracks of said second party on said premises, other than that of its main line, shall from time to time be adjusted and extended so as to enable said first party, and its lessees, successors, and assigns, to quarry and remove stone from any of said premises for transportation. as aforesaid.

"And the said second party, for itself, its successors and assigns, covenants with said first party, its successors, lessees, and assigns, that it will from time to time, as said first party, or its successors or lessees, shall open any quarry or locality upon said premises hereinbefore described, and to which said first party shall properly grade and provide a suitable road-bed for such track or its extension, the said second party will, upon reasonable notice thereof, tie, iron, and operate such track or extension in connection with its main or its other tracks, and so from time to time, as such track extension is graded and required, will tie, iron, and operate the same as above provided, and will transport all stone so reached by its said tracks, when loaded upon its cars by said first party, its lessees or assigns, over its said line of railway, in connection with the railroad of the St. Paul & Duluth Railroad Company; and for that purpose it will, upon request from time to time, and within a reasonable time, furnish to said first party, its successors, lessees, and assigns, upon its said tracks, convenient for loading, all cars necessary for the transportation of such stone.

"It is further agreed that, in case the said first party, or its successors, lessees, or assigns, shall construct suitable railroad track or

v.41m.—30

tracks from any of its quarries, or from the main or side tracks of the said second party, to its dumping grounds, for the removal of offal and unmarketable stone and other material, the said second party will, on reasonable notice, furnish cars therefor, and transport such material, provided the same is loaded and unloaded by said first party, or its successors, lessees, and assigns, for which said transportation said second party shall be paid a reasonable compensation.

"And the said first party covenants, for itself and its successors, that all marketable stone hereafter to be quarried, removed, and transported by rail from the lands or premises hereinbefore first described, shall be worked, quarried, or transported over and in connection with the tracks of the said second party, and that the tracks of the said second party shall be extended to the same as aforesaid, so as to secure to the said second party, and its successors and assigns, the exclusive right to transport the same upon the terms and conditions aforesaid.

"It is further expressly and mutually agreed and covenanted that all and singular the grants and provisions hereinbefore set forth shall be and continue to be binding and obligatory upon the respective parties hereto, their respective successors, lessees, and assigns."

This instrument, duly executed and acknowledged by both parties, was recorded in the office of the register of deeds of Pine county, where all the lands lie, on November 26, 1887. And it also appears that the plaintiff has constructed its line of road from a point on the main line of the St. Paul & Duluth Railroad, through several sections, into and through several subdivisions of section ten, (10,) in township 42, with an extension and spur track in and through the stone-quarries referred to, and with proper side tracks, so as to accommodate the business thereof, and "transport all stone and other freights requiring transportation over its said railroad and its connections." The plaintiff also alleges that it has fully kept the agreement on its part, and furnished all necessary cars and rolling stock, and transported the stone quarried on the premises, and has procured, "from its connection with the railroad of said St. Paul & Duluth Railroad Company, the perpetual right to transport, or have transported, all stone quarried or to be quarried upon said premises,

from the quarries aforesaid, to St. Paul, Minneapolis, Stillwater, and all other points and connections reached by said lines of railway of said St. Paul & Duluth Railroad Company, at and for a reasonable compensation." It also appears that the right of way through certain portions of sections 10 and 15 referred to in the deed has been duly designated and appropriated.

The main line of the defendant corporation, Eastern Railway Company, passes through the N. E. ¼ of section 10.

Subsequent to the record of the indenture above referred to, and on the 30th day of November, 1887, the sandstone company entered into an agreement for a lease of certain of the lands in question, owned by them in sections 10 and 15, with the defendants Ring & Tobin, for the term of 10 years, under which they were to work the quarries, and market stone quarried from the same, for a royalty to be paid to the sandstone company, and which lease was "made subject to all of the rights and privileges, and the said second parties (Ring & Tobin) hereto are entitled to all the benefits, which may accrue to either of the parties hereto by virtue of the contract" with the plaintiff, being the indenture referred to. The lease was recorded April 17, 1888. In the month of July, 1888, the Kettle River Sandstone Company conveyed the lands embracing the quarries in question, by deed of bargain and sale, to a corporation known as the "Northern Land Company." And on the 8th day of September, 1888, the Kettle River Sandstone Company, by an instrument under seal, released and discharged the lessees, Ring & Tobin, from all obligations and liabilities under the lease to them previously executed. A tripartite agreement bearing date August 20, 1888, was entered into between the Northern Land Company of the first part, defendants Ring & Tobin of the second part, and the defendant Eastern Railway Company of the third part. Under this agreement the Northern Land Company leased to Ring & Tobin lands in sections 10 and 15 in question, thereby giving them the exclusive right to occupy the leased premises, and to quarry and transport stone therefrom, and to operate necessary machinery thereon, for the business of quarrying stone and loading it upon cars. And the lessees, Ring & Tobin, on their part, agree that they will ship all stone to be trans-

ported from the demised premises by the line or lines of railway of the party of the third part, to all points reached by the same, and beyond said lines will, so far as reasonable and practicable, ship said stone over the line of the St. Paul, Minneapolis & Manitoba Company, "provided that the foregoing covenant shall not be binding until said third party shall have constructed a suitable line of railway into said premises." The agreement also contains proper covenants for the grant of such right of way to the party of the third part, for its tracks, as may be necessary for its business in connection with such quarries. And the Eastern Railway Company, party of the third part, covenants and agrees to construct a branch or extension of its road into and upon the premises so leased, and to transport all the stone quarried by the lessees to points reached by it.

The plaintiff obtained a temporary injunction on the ground that the defendants were threatening to grade and extend the line of the Eastern Railway over the tracks, premises, and property of the plaintiff, and to destroy the tracks, and divert and destroy its business, and render its line of no practical value.

The facts as above stated are substantially admitted by the defendants in their answer, and they admit that, at the commencement of this action, the Eastern Railway Company was constructing a railroad from its main line into the said stone-quarries, upon the location indicated by the map annexed to the answer, for the purpose of reaching the quarries in question, in order to transport over its road the products thereof; and that it has acquired the right of way therefor by deed from the Northern Land Company; and they deny that the construction of their tracks has or will injure the tracks, side tracks, or property of the plaintiff, as alleged in the complaint; or that the construction of the said road will in any manner hinder or interfere with the said road of the plaintiff, except that, by legitimate competition, the Eastern Railway Company expects to secure all or a portion of the traffic originating in the quarry; and they deny that the Eastern Railway Company has graded or built its railroad upon or touching any property of the plaintiff. They allege that only a part of its proposed line has as yet been built, and that, if built as proposed, it will touch the track or property of the plaintiff at one point only, and

involve but one crossing thereof, and will result in no substantial injury or inconvenience to plaintiff's property except through the diversion of traffic.

1. The stipulation in the lease of the sandstone company to Ring & Tobin, which makes the lease subject to the contract between plaintiff and the sandstone company first above referred to, was binding only during the continuance of the lease. The plaintiff was not a party to it, and there was no privity between Ring & Tobin and the plaintiff. The lease might be terminated by their failure to comply with certain conditions therein specified, or by the voluntary act of the parties thereto, as was done. Ring & Tobin assumed no personal obligation or liability, and are not bound by the covenants in that contract, unless their present lessors, the Northern Land Company, are so bound. *Scott* v. *McMillan*, 76 N. Y. 141. And upon this point counsel do not appear to disagree.

2. It will be observed that the indenture or contract with the plaintiff, which was made, among other things, "to secure a right of way" for its road, assumes to grant "so much of said real estate and premises as may be necessary and convenient for the maintenance and operation of its line of railroad as now constructed, or as the said second party may hereafter, from time to time, desire to relocate and construct, with all necessary buildings, side tracks," etc. And also "grants to said second party, its successors or assigns, the exclusive right of way, for railroad purposes, of such reasonable width as said second party may from time to time require and designate, * * * so as to reach all stone-quarries that may hereafter be opened or worked at any point or place within the limits of the real estate hereinbefore described." This grant, being in derogation of common right, should receive a strict construction; but we think, taking the several covenants together, it was manifestly the purpose of the parties to exclude other railways from access to the quarries, and from any share in the transportation of the stone quarried therein. But the plaintiff did not and could not, under the terms of its grant, acquire title to its right of way or other lands necessary for its business, until the same was actually selected, located, and designated. Prior to such location its grant was a mere "float," and no title

passed to any definite portion of the premises.    There was nothing, then, to prevent any other railroad company from acquiring by condemnation a right of way over any portion of the territory in question not already actually appropriated by the plaintiff.    The plaintiff has no ground, therefore, upon which to base legal proceedings against the Eastern Railway Company, except for an injury or interference, actual or threatened, to its right of way and grounds actually selected and  designated for its use; for it is not apparent that it would ever want the particular land taken or occupied by the Eastern Company.    And, in respect to the continuance of the injunction against the latter company, this presents the only practical question to be considered here on this branch of the case.    The question as to that company's corporate authority, under its charter, to acquire a right of way over these particular lands for a branch or extension cannot be raised by a third party, who has no interest in the land taken, and whose legal rights are not affected.    Should it attempt to take or cross the plaintiff's right of way under condemnation proceedings, the plaintiff will then be in a position to raise that question.

But neither of these corporations can enter into a contract which courts will recognize as valid for such exclusive rights in the territory in question as the plaintiff claims.    Neither could altogether exclude the other from the premises, or prevent land not already appropriated or shown to be required for its own corporate use from being taken or acquired in any lawful way by another corporation for a use which is recognized as public.    Such contracts are against public policy, and void.    Greenhood, Pub. Pol. 672, and cases cited; *W. Va. Transportation Co.* v. *Ohio River Pipe-Line Co.*, 22 W. Va. 600, 626.    It is insisted, however, by the plaintiff, that the proposed branch lines to these quarries, which are the property of private owners, are for the accommodation of private interests only, and not for a public use, and hence that the power of eminent domain cannot be exercised; and that the contract must be deemed to relate to private interests only, and is not, therefore, subject to this objection. . But these corporations are each *quasi* public corporations, and are, under their charters, authorized to exercise the

right of eminent domain; and the question whether the use is public or private does not depend upon the amount of business, or the number of persons who have occasion to use either road, but upon the right of the public to require the corporations to carry their freight. *De Camp* v. *Hibernia R. Co.*, 47 N. J. Law, 43. If all the people have a right to use the road, it is a public use or interest, though the number who have business requiring its use may be small. *Phillips* v. *Watson*, 63 Iowa, 28, (18 N. W. Rep. 659;) *Clarke* v. *Blackmar*, 47 N. Y. 150; Lewis, Em. Dom. § 166. The cases cited fully illustrate and support the principle, and of its correctness there can be no doubt. And it will be time enough to determine the full extent of plaintiff's rights in the tract in question when it shall attempt to define the extent and limits of the right of way and grounds claimed to be reasonably necessary for its use.

3. But the most important question in the case is whether the burden of the covenant in the deed of the sandstone company, whereby that company undertakes "that all marketable sandstone hereafter to be quarried, removed, or transported by rail from the lands or premises" described in the deed "shall be worked, quarried, or transported, over and in connection with the tracks of" the plaintiff, rests upon the grantees of the sandstone company. The parties, undoubtedly, have very clearly expressed their intention that this covenant should bind the assignees and successors in interest of the parties. No mere form of words, however, is sufficient for such purpose; but the nature of the covenant and its relation to the estate must be such that the law will permit the intention to be effectual. *Masury* v. *Southworth*, 9 Ohio St., 341, 348. Strictly speaking, at law there must be privity of estate existing between the parties when the covenant is made, and it must concern the land or estate. "The covenant must respect the thing granted or demised. When the thing to be done or omitted to be done concerns the lands or estate, that is the medium which creates the privity between the plaintiff and defendant." *Bally* v. *Wells*, 3 Wils. 25. It must inhere in or be attached to the land, or relate to its mode of occupation or enjoyment. And it runs with the land when either the liability to perform it or the right to take advantage of it passes to the assignee of the land. *Savage* v. *Mason*,

3 Cush. 500; *Shaber* v. *St. Paul Water Co.*, 30 Minn. 179, (14 N. W. Rep. 874.) In some cases covenants in respect to lands are construed as equivalent to the grant of an easement or servitude, and as such held to attach to the land, and run with it regardless of change of ownership. *Weyman* v. *Ringold*, 1 Bradf. Sur. 40, 54; *Bronson* v. *Coffin*, 108 Mass. 175. Thus a covenant by a railway company to keep its right of way fenced, or a covenant by an adjoining owner, for himself and his heirs and assigns, to maintain a division fence, is construed to be a grant creating an easement. *Boyle* v. *Tamlyn*, 6 Barn. & C. 329; *Blain* v. *Taylor*, 19 Abb. Pr. 228; *Easter* v. *Little Miami R. Co.*, 14 Ohio St. 48; *Hazlett* v. *Sinclair*, 76 Ind. 488. In *Pitkin* v. *Long Island R. Co.*, 2 Barb. Ch. 221, (47 Am. Dec. 320,) an agreement by the defendant with the owner of adjoining land to maintain a side track and depot at a particular point, and in *Gilmer* v. *Mobile & M. Ry. Co.*, 79 Ala. 569, a similar agreement, with the grant of the right to cultivate certain portions of the right of way, were supported on similar grounds; the chancellor saying, in his opinion in the first-named case, that "it was, in substance, the grant of an easement or servitude, which was to be binding on the property of the railroad company as the servient tenement, for the benefit of the complainant and those who should succeed him in his estate." But in any event these were covenants that could have been upheld and enforced in equity against all subsequent purchasers or owners with notice. But the covenant under consideration is, in substance, a traffic agreement, giving to the plaintiff the exclusive railway transportation of the product of the quarries. The track had been laid to the quarry when the agreement was made, and it contains provisions for its extension to other parts of the quarry at the joint expense of the parties. To secure this transportation was the consideration which induced the plaintiff to construct the road and enter into the contract. But it is not a covenant real, and does not run with the land as such. It is not of such a nature that it can be said to inhere in the land, nor does it grant any right or easement therein. As respects the land, plaintiff's grant is limited to its right of way, and the right to use and occupy such portions of the premises as it may require for its business. But it has no easement in the rest of the premises. It is to

furnish track and cars for the transportation of stone, as it might, under other circumstances, to a lumber-yard or grain elevator, under a similar contract. It has no right to operate the quarry, and has no other interest in it. The quarried stone is personal property which the sandstone company covenanted should be transported as freight by plaintiff's railway. But conceding the personal liability of that company for the violation of that covenant, it is not binding on the Northern Land Company or its lessees, if it does not run with the land, or does not constitute a charge upon it. The case of *Hemingway* v. *Fernandez*, 13 Sim. 228, cited and relied on by the plaintiff, is dissimilar in important particulars. In that case there was a lease, and a tenure was created, and the stipulation, agreeing to transport all the coal mined from certain land, and to pay a certain rate per ton for all the coal so conveyed, was in the nature of a covenant for the payment of rent. 1 Smith, Lead. Cas. (8th Ed.) 187.

4. The Northern Land Company acquired its interest with notice of plaintiff's rights; for it is a general rule that a purchaser is bound to inquire into the title of his vendor, and is affected with notice of any equities that appear upon the title. Leake, Cont. 1236; *Hazlett* v. *Sinclair*, 76 Ind. 488. And here the deed containing the stipulation and covenants in question had been duly recorded. It is therefore very earnestly contended by the plaintiff that, since these parties have acquired their title and interest with notice, equity will not permit them to evade the covenant in relation to the transportation, but will enforce it by injunction. There is a growing tendency to incorporate equitable doctrines with common-law rules, and, in equity, covenants relating to land, or its mode of use or enjoyment, are frequently enforced against subsequent grantees with notice, though there is no privity of estate, and the covenants do not strictly run with the land. Mr. Pomeroy (3 Eq. Jur. § 1295) states the rule broadly as follows: "Where, in a deed, the grantor covenants concerning the land or its use, restricting certain specified uses, subjecting it to easements, servitudes, or the like, and the land is afterwards conveyed or passes to one who has actual or constructive notice of the covenant, the grantee or purchaser will take the premises bound by the covenant, and will be compelled, in equity, either to specifi-

cally execute it, or will be restrained from violating it. It is not material whether the covenant is or is not one which runs with the land." And in the leading case of *Tulk* v. *Moxhay*, 2 Phillips, 774, the doctrine is stated as follows: "A covenant between vendor and purchaser, on the sale of land, that the purchaser and his assigns shall use or abstain from using the land in a particular way, will be enforced in equity against all subsequent purchasers with notice." Under this rule, covenants are sustained and enforced against assignees with notice stipulating for a particular mode of improvement, occupation, or use of lands, and it is especially applicable to restrictive covenants; thus, covenants in respect to the mode of building or occupying parts of a once common estate; certain stipulations made by the owners or in deeds as to the use of ways; for light and air, etc.; reserving premises exclusively for dwelling-houses; prescribing manner of improvement; not to carry on particular trades or business, as, for instance, not to use premises for sale of intoxicating liquors, or for an inn, tannery, gas-house, etc. 2 Washb. Real. Prop. (5th Ed.) 323; *Parker* v. *Nightingale*, 6 Allen, 341, (88 Am. Dec. 632;) *Barrow* v. *Richard*, 8 Paige, 351, (35 Am. Dec. 713;) *Trustees of Columbia College* v. *Lynch*, 70 N. Y. 440, 447; *Hodge* v. *Sloan*, 107 N. Y. 244, (17 N. E. Rep. 335;) *Whitney* v. *Union Ry. Co.*, 11 Gray, 359, (71 Am. Dec. 715;) *Wilson* v. *Hart*, L. R. 1 Ch. 463; *Luker* v. *Dennis*, 7 Ch. Div. 227; *Town of Middleton* v. *Newport Hospital*, (R. I.) 15 Atl. Rep. 800; *Kirkpatrick* v. *Peshine*, 24 N. J. Eq. 206, 214; *Appeal of St. Andrew's Church*, 67 Pa. St. 512; *Tulk* v. *Moxhay*, 2 Phillips, 774. Such privileges or restrictions, which are sometimes called equitable easements, servitudes, or amenities, are enforced by injunction irrespective of the question of privity of estate, or the nature of the tenure, but they must be such as relate to or concern the land or its use or enjoyment. It is not enough that a covenant affects the use of land, or the enjoyment of an easement therein, or the value or profitableness of the use thereof, in a collateral way. *Mayor* v. *Pattison*, 10 East, 130. That the plaintiff, as a common carrier, should have a monopoly of the transportation of the freight to and from the quarries is not a privilege affecting the land of either party to the covenant, except in a col-

lateral· way, though it might very seriously affect the amount and value of its freight business, and have been the chief inducement for constructing the road. In other words, equity follows the law in that it will not enforce a covenant as against the heir or assignee unless the obligation it imposes is one which attaches to or concerns the land or its use or mode of enjoyment. *Norcross* v. *James,* 140 Mass. 188, (2 N. E. Rep. 946.) In *Keppell* v. *Bailey,* 2 Mylne & K. 517, 535–6, the owners of the Beaufort Iron-Works covenanted with the Trevil Railroad Company that they and their assigns would procure all the lime-stone used in their iron-works from the Trevil quarry, and carry it and the product of their furnaces over the Trevil Railroad to their works, paying a certain toll therefor. The Trevil Railroad was constructed in reliance upon this covenant. The iron-works were assigned, and the assignees undertook the construction of another railroad to other quarries. The suit was brought for an injunction restraining the owners of the iron-works from using the new road to transport the limestone. The chancellor refused the relief asked, holding that the covenant, which assumed to bind assigns, was essentially personal in its character. " There can be no harm in allowing the fullest latitude to men in binding themselves and their representatives, that is, their assets real and personal, to answer in damages for breach of their obligations," but, in respect to burdens or servitudes to be imposed permanently on the land, " there are certain known incidents to property and its enjoyment; * * * certain burdens wherewith it may be affected, or rights which may be created and enjoyed over it by persons other than the owner, all which incidents are recognized by the law. * * * But it must not therefore be supposed that incidents of a novel kind can be devised and attached to property at the fancy or caprice of any owner." So in *W. Va. Transportation Co.* v. *Ohio River Pipe-Line Co.,* 22 W. Va. 626, an agreement by a land-owner that products of his land (in that case oil) should be transported exclusively by one company was not a real covenant, and would not be enforced against subsequent purchasers with notice, distinguishing (page 633 et seq.) the covenant in that case from those which are held to create equitable easements or servitudes or interests in land

such as to bring them within the equitable doctrine of notice. *Keppell* v. *Bailey* has, in several instances, been referred to in the books as having been overruled, and it is said that the propositions of the chancellor therein laid down are not sustained by the courts of chancery. Whether all that is said in that case is or is not strictly accurate we need not now consider, but we are unable to find that any court has ever undertaken to say that it was not correctly determined. And, in so far as the application of the equitable doctrine is concerned, we think that the cases of *Keppell* v. *Bailey* and *W. Va. Transportation Co.* v. *Ohio River Pipe-Line Co.* are not distinguishable from the case at bar. And, referring to *Keppell* v. *Bailey*, the learned American editor of Smith's Leading Cases (volume 1, p. 198) says, justly, we think, that " the covenant in that case failed to run with the land, not so much because it imposed a burden, or from the want of privity of estate, as because the rights and restrictions which are imposed on the one hand or conferred on the other went beyond the limits of any estate or interest in land known to the law, or which it will permit to be invested with the capacity for assignment or transfer; and sound policy will not allow an end to be attained by a covenant which cannot be directly effected by a grant." And, as before indicated, though a covenant is made by one for himself and assigns, yet, if the thing to be done is merely collateral, and does not affect the land itself, though its use or enjoyment may thereby be rendered more valuable, an assignee is not bound at law or in equity. *Blain* v. *Taylor*, 19 Abb. Pr. 230; *Mayor* v. *Pattison*, 10 East, 130. The tendency of the later decisions, both in this country and in England, is, we think, to restrict rather than to extend the equitable doctrine of notice we have referred to. *Brewer* v. *Marshall*, 19 N. J. Eq. 537, 546, (97 Am. Dec. 679;) *W. Va. Transportation Co.* v. *Ohio River Pipe-Line Co.*, *supra; Norcross* v. *James*, 140 Mass. 188, (2 N. E. Rep. 946;) *Haywood* v. *Society*, 8 Q. B. Div. 403, 408; *London & S. W. Ry. Co.* v. *Gomm*, 20 Ch. Div. 562; *Austerberry* v. *Oldham*, 29 Ch. Div. 750; *Grigg* v. *Landis*, 21 N. J. Eq. 494, 502.

The order appealed from is reversed, and the injunction directed to be dissolved as to the defendants Ring & Tobin, and modified

and limited as to the Eastern Railway Company so as to restrain any interference with the lands, right of way, and property of the plaintiff.

NOTE. A motion for reargument of this case was denied October 25, 1889.