Martin, J., concurred; Hardin, P. J., not sitting.

Judgment reversed on the exceptions and a new trial ordered, with costs to abide the event.

---

In the Matter of the Application of the SPLIT ROCK CABLE COMPANY to Acquire Certain Real Estate Owned by CHARLES HUGHES and Others.

*Eminent domain — what must be shown by a tram-way company seeking to acquire land — what is not a public use.*

In proceedings to condemn land under the right of eminent domain for the purposes of the road-way of an elevated tram-way company, incorporated under chapter 462 of the Laws of 1888, it is incumbent on the petitioner to show, first, a legislative warrant for such proceedings on its part; and, second, if the right is challenged, that the business which it is organized to carry on is public, and that the taking of private property for the purposes of the corporation is a taking for public use.

The true criterion by which to judge of the character of the use is to determine whether the public may enjoy it by right or only by permission.

Where an elevated tram-way consists of two elevated cables about ten feet apart, on which boxes are run by means of a trolley or pulley, one line taking the boxes that have been filled, and the other line taking back the boxes that are empty, and there is no access at one end of the tram-way, except over a private road, so that the public cannot make use of it at that end, except at the will of the owner of such private road, and where the service of the tram-way is intended to subserve the interests of one particular company, and the general public have no opportunity to use it, except as there may be a surplus capacity after supplying the uncertain and increasing wants of such company, the tram-way company is not in the position of a common carrier, and land sought to be taken for its purposes cannot be deemed to be taken for public use.

APPEAL by Charles Hughes, James Hughes and Eugene Hughes, certain land holders, from an order of the Supreme Court, made at a Special Term thereof, and entered in the Onondaga county clerk's office, November, 1889, which held that no sufficient cause was shown against the granting of the prayer of the petitioner in the above-entitled matter as to the parcel of real estate described in said order, and appointed commissioners to appraise and ascertain the compensation to be made to such landowners, and directed the place and time of the first meeting of such commissioners.

The proceedings were instituted by the Split Rock Cable Road Company for the purpose of acquiring title to certain real estate for its purposes.

The petition of the applicant, verified October 15, 1889, alleged that it was incorporated on the 19th of June, 1888, under an act of the legislature entitled "An act to authorize the formation of elevated tram-way corporations and to regulate the same," passed June 2, 1888; that it was its intention to construct and finish a railroad, as stated in its articles of association, commencing at or near Split Rock in the town of Onondaga, and running thence by the most direct and feasible route, *via* the towns of Onondaga, Camillus and Geddes, in the county of Onondaga, and terminating at or near Onondaga lake in the town of Geddes; that $10,000 for every mile of the road proposed to be constructed had been in good faith subscribed to the capital stock, and ten per cent thereof paid in; that the company had surveyed the land or route of its proposed road, and had made a map or survey thereof, by which its route or line was desig-

nated, and it had located its road according to such survey and filed certificates thereof, signed by a majority of its directors, in the office of the county clerk of Onondaga county, that being the only county through or in which the road was to be constructed; that its tramway or road had been completed and was in operation from a point about the northern line of premises in the town of Onondaga formerly owned by James Hughes, deceased, northerly through Onondaga, Camillus and Geddes to a point at the Erie canal at or near the works of the Solvay Process Company; that the real estate the petitioner sought to acquire is five and thirty-six one-hundredths acres in the town of Onondaga, its description being given, and the names and places of residence of those who own or claim to own the lands were stated to be Charles Hughes, James Hughes and Eugene Hughes, of Syracuse, and the Solvay Process Company of Geddes; that the described real estate was required and necessary for the purposes of the incorporation of the petitioner for the purpose of constructing and operating its road, and of erecting and maintaining necessary and convenient buildings, stations, fixtures and machinery for the accommodation and transaction of its business; that the petitioner had not been able to acquire title for the reason that the owners refused to sell for a reasonable compensation.

The present appellants answered, admitting that they owned the real estate described in the petition, and that the petitioner had constructed a double cable from Split Rock to the Solvay Process Company for the purpose of carrying stone to that company, and denying, in substance, all the other allegations. They also alleged that the petitioner was a private corporation for private uses; that the lands sought to be taken were not necessary for its buildings, but valuable quarry lands, and were only sought for the use of the Solvay Process Company, and that the Solvay Company owned, controlled and operated the petitioner as an adjunct to their business in the manufacture of soda ash, and that the cable-road company was intended for no other use.

*Hogan & Stern,* for the appellants.

*Tracy, McLennan & Ayling,* for the petitioner, respondent.

MERWIN, J.:

In cases of this kind, it is incumbent on the petitioner to show first a legislative warrant, and second, if the right is challenged, that the business, which it is organized to carry on, is public, and that the taking of private property for the purposes of the corporation is a taking for public use. (*Matter of Niagara Falls and Whirlpool R. R. Co.*, 108 N. Y., 373.)

The articles of association of the petitioner, which are acknowledged June 13, 1888, and filed June 19, 1888, state that the subscribers "have associated together as an elevated tram-way corporation to continue in existence for the period of fifty years, for the purpose of constructing, maintaining and operating an Elevated Tram-way between Split Rock and Onondaga lake, a distance of about four miles, both of which places are in Onondaga county." The amount of the capital stock is stated to be $52,000 and the number of directors three. The number of shares that each subscriber agrees to take is set opposite his name and the aggregate amount so agreed to be taken is the full amount of the capital stock. Nothing is said in the articles as to what statute the incorporation is designed to be under, but it is claimed, and it may be inferred, that the incorporation is under chapter 462 of the Laws of 1888, entitled "An act to authorize the formation of elevated tram-way corporations and to regulate the same," passed June 2, 1888 and taking effect immediately.

By section 1 of that act, it is provided that any number of persons, not less than thirteen, "may form a company for the purpose of constructing, maintaining and operating an elevated tram-way, constructed of poles, piers, wire, rods, ropes, bars or chains, for the transportation of freight in suspended buckets, cars or other receptacles for hire; and for that purpose may make and sign articles of association, in which shall be stated the name of the company; the number of years the same is to continue; the places from and to which the said tram-way is to be constructed, maintained and operated; the length of said tram-way as near as may be; the name of each county in this State through or in which it is made or intended to be made; the amount of the capital stock of the company and the number of shares of which said capital stock shall consist, and the names and places of residence of the directors of the company, which shall not be less than three, who shall manage its

affairs for the first year, and until others are chosen in their places."
By section 6 it is provided that every corporation formed under the
act "shall have power and authority (1) to cause such examination
and surveys for its proposed tram-way to be made as may be neces-
sary to the selection of the most advantageous route, and for such
purposes, by its officers and servants, to enter upon the lands or
waters of any person, but subject to responsibility for all damages
which shall be done thereto ; (2) to lay out its tram-way and to con-
struct the same as hereby provided." By section 7 it is provided
that in case any company formed under this act is unable to agree
for the purchase, use or lease of any real estate required for the
purposes of its incorporation, it shall have the right to acquire title
in fee to the same in the manner and by the proceedings provided
by law for acquiring title to lands for railroad use by railroad cor-
porations, under the provisions of chapter 140 of the Laws of 1850
and the several acts amending the same or supplemental thereto, so far
as the same are applicable. By section 9 any corporation formed under
the act has power and authority to erect and maintain all necessary and
convenient buildings, stations, fixtures and machinery for the accom-
modation and transaction of its business. The act does not in terms
provide that the property taken shall be deemed to be for public use,
or that the tram-ways are to be constructed for public use.

The capital stock of the petitioner was all paid in, and in June,
1889, it completed its tram-way from Split Rock northerly to near
the Erie canal, a distance of about three and a half miles, and since
then it has been in operation. The tram-way consists of two ele-
vated cables, held up on supports and parallel to each other, about
ten feet apart, on which run buckets by means of a trolley or pulley,
one line taking the buckets that have been filled and the other line
taking back the buckets which are empty. The location of the
southern terminus of this tram-way is upon the land of the peti-
tioner, just north of the lands now desired to be taken, and is in
a gorge about ninety feet lower than the Hughes land. This
terminus seems to be the southern terminus of the line of the tram-
way as indicated upon the map or profile originally filed by the
company. The company has filed no map indicating that its route
extended over the lands in question, and the original map filed by
the company did not indicate that the lands in question were to be

taken for the purposes of the company. In the vicinity of this southern terminus, as so located, the Solvay Process Company owns upwards of 100 acres of land, upon which are quarries, and which entirely surrounds the terminus as well as the Hughes lands, and shuts them out entirely from any highway. There is to the Hughes land a road, but it is owned by individuals, and is not a public road. Who are the owners of this private road does not appear. The highway is about 1,200 feet distant.

The northern terminus of the tram-way, as now built, is on the land of the Solvay Company, at the lime kiln of their works, about 500 feet from the Erie canal. The route of the tram-way, as projected, extends northerly some distance, over the Erie canal and the Central railroad to Onondaga lake.

The carrying capacity of the road, as now constructed, is testified to be 750 tons a day. They have thus far carried for the Solvay Company, 350 to 400 tons of stone a day, and seem to have been kept running night and day. They have not carried anything for any other party. The Solvay Company is a large concern and its business is increasing. The incorporators of the petitioner were practically all stockholders in the Solvay Company. The surplus of the capacity of the road, after supplying the Solvay Company is, according to the evidence of the president of the petitioner, to be devoted to public use in carrying, in buckets, freight offered to it by any person, suitable to the buckets and to the road. What that surplus may be, as the Solvay Company continues to develop, is uncertain. The evidence clearly shows that the business of the petitioner will be subservient to the Solvay Company. The road has thus far been entirely for its benefit.

The intention of the petitioner, as its president testifies, is to use the land in question to increase its terminal facilities by building tram-ways on the surface to facilitate the carrying of stone to the cable station, by erecting buildings for the storage of freight and for repair shops, and to furnish means of access. The petitioner has other land that might be used for terminal facilities, but it is not so convenient. Aside from stone, the chief subject for freight is said to be coal, and, in regard to that, the president testifies, " we intend to make a contract with some private individual to furnish him with coal, so that he can transport it or sell it to people in that

vicinity; to establish a coal yard the same as anywhere, not that the Solvay Process Company or the Cable Company will establish a coal yard; some individual will have to run it; with whom we will make a contract to carry coal; and we propose to limit that contract to one individual for the present." This would hardly be a public use.

The appellants own the property in question, and it consists of a valuable quarry. Their contention is that the only object of this proceeding is to compel them to sell it for the benefit of the Solvay Company.

If the question of public use is to be determined from the nature of the business of the Cable Company, as described in its articles of association, then there would be a failure to show a design to construct a way for public use. No such design is stated in the articles. An elevated tram-way is not necessarily public. It may or may not be. The public use or purpose should affirmatively appear. (*Attorney-General* v. *City of Eau Claire*, 37 Wis., 401.) If left optional with the future management of the company, it would at least be doubtful whether a good basis would be furnished for the exercise of the right of eminent domain. Nor does the statute of 1888 fix a public character upon such corporations except possibly by way of inference. The organizations under that act are not limited to roads for public use, nor is the property acquired declared to be for public use. In this respect it differs from the present railroad act (chap. 140 of 1850, §§ 1, 18) and from the act for the organization of pipe lines. (Chap. 203 of 1878, §§ 1, 20.)

The president of the company, however, testifies that it is the intention of the corporation to carry all freight that may be offered of the kind it can carry, up to the extent of its capacity. In other words, it is intended that the corporation shall be a public one in the nature of a highway. What action the board of directors, as such, may have taken on the subject does not appear. So that, apparently, there is nothing to prevent the board of directors or some future president from having a different view. The plant of the company has cost about fifty thousand dollars, so that the capital is substantially exhausted. Nothing is shown as to the means of the company for enlarging its boundaries or increasing its facilities.

The true criterion by which to judge of the character of the use is, whether the public may enjoy it by right or only by permission. (Mills on Eminent Domain, § 14; *Kettle River R. Co.* v. *Eastern*

*Ry. Co. of Minn.*, 41 Minn., 461.)   The undertaking of a common carrier is to carry for all people indifferently.   (2 Kent's Com., 598.)

If, in the present case, there is no access to the southerly terminal except over a private road, then the public cannot, at that end, use the cable except at the will of the owner of such private road, or of the Solvay Company, the owner of the surrounding territory. So, if the Cable Company is run subservient to the interest of the Solvay Company, and the general public have no opportunity to use it except as there may be a surplus capacity after supplying the uncertain and increasing wants of the Solvay Company, then the Cable Company is not in the position of a common carrier.   The service of the Solvay Company is the main object; the service of the public is subordinate and contingent.   For such a service the right of eminent domain should not be exercised.   (*Matter of Application of Eureka Basin W. and M. Co.*, 96 N. Y., 42; *Matter of Niagara Whirlpool Ry. Co.*, 108 id., 375.)   As said by RUGER, Ch. J., in *Matter of Staten Island Rapid Transit Company* (103 N. Y., 257), "the exercise of this power is in derogation of individual rights, and is always burdensome and often injurious to the owner beyond the power of pecuniary compensation to wholly redress, and should be allowed only when the necessity for the land clearly appears, and it proposed use clearly embraced within the legitimate objects of the power."

Having in view the manner and form of the organization of the petitioner, and its subsequent acts, the location of its southerly terminus and the absence of public approach, its private use thus far and the lack of opportunity for the public to use, except after the wants of another company are supplied, and its apparent subserviency to the interests of that company, and the contingent and uncertain character of any future development for the benefit of the public, we are of the opinion that the evidence does not establish the conclusion that the taking here sought to be made is for public use.

It follows that the order should be reversed and proceedings dismissed, with costs.   (Code of Civ. Pro., § 3240; 96 N. Y., 42, 49, *supra; Matter of N. Y., L. and W. R. R. Co.*, 26 Hun, 592.)

HARDIN, P. J., and MARTIN, J., concurred.

Order reversed and proceedings dismissed, with costs.   (Code of Civ. Pro., § 3240; 96 N. Y., 42; 26 Hun, 592.)