WALLACE D. LUND v. VILLAGE OF PRINCETON.

85 N. W. (2d) 197.

August 23, 1957—No. 36,874.

474

*C. C. Mitchell, Faegre & Benson,* and *Charles B. Howard,* for appellant.

*Dygert & Riordan,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Plaintiff, Wallace D. Lund, brought this action against the village of Princeton for breach of an implied oral contract to supply reasonable electrical power to the plaintiff's chicken hatchery in Princeton. The jury returned a verdict for the plaintiff in the amount of $18,000. Defendant appeals from an order denying its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

From 1937 to 1948 plaintiff operated a single 72,000-egg Snow incubator with 12 elements rated at 230 volts on the main floor of his building. In the fall of 1948, he tore down this machine and reassembled it in his basement. In 1949 he added and assembled two 36,000-egg machines in his basement, which were also rated at 230 volts. In 1951 the 72,000-egg machine was junked and thereafter only the two 36,000-egg machines were continued in use.

Until 1947 defendant had transmitted the electric power to plaintiff through a delta transformer bank. In 1947 the delta system was replaced with a wye system. It is conceded that the change was a reasonable one and that a wye transformer is at least as satisfactory as a delta transformer for general use. Theoretically, if 2,400 volts of power reach the transformer on the primary side and there is a 10:1 transformation ratio, the delta transformer will produce 120 volts for lighting and 240 volts for heat and power, while under the same circumstances, the wye system will produce 120 volts for lighting and 208 volts for heat and power. In other words, with a delta system the heat and power voltage (240) is twice the line to neutral voltage (120)

but in a wye system, the heat and power voltage (208) is the product of the line to neutral voltage (120) and the square root of three (1.732). In both systems there is some fluctuation in voltage. With nominal 220-volt service in a delta system, the heat and power voltage may fluctuate between 205 and 230 volts, and with nominal 208-volt service in a wye bank, a variation between 205 and 216 volts is normal.

Sometime after 1951 and before 1953, another change in transformers was made. After this second change, the hatchery was served by a different wye transformer bank from the one installed in 1947. This new wye transformer did not have taps as did the first, and the result was an additional reduction to the extent of two or three volts.

Plaintiff testified that prior to 1948 he had had no trouble with the 72,000-egg machine; that when the machine was set, it required an hour and a half to get the heat up to normal; and that after that the heat from the eggs was sufficient. During this period he had average hatches of about 74 percent of the eggs set; that in 1948 he and a former employee, Lester Jensen, noticed a drop in the percentage of hatches and noticed that the incubator lights were lighted to a greater extent than before, indicating that the units had to be operated more than usual to maintain normal heat. He called in Mr. James R. Kotsmith, then superintendent of defendant's electric plant, and requested that he try to do something with the incubator so that it would produce more heat. Kotsmith shortened some of the units in order to create more heat. Later, when it was moved into the basement, Kotsmith was called in to wire it, and still later, he was engaged to wire the two smaller incubators which were added in 1949. Roger Snow, the manufacturer of the incubator, was called in 1952 and in 1953 to advise plaintiff as to his problems. Plaintiff also called Edwin E. Broas, another electrician, to examine the incubators in the spring of 1953. At no time had plaintiff been advised that defendant had changed the system from a delta to a wye transformer system at the time above mentioned.

Kotsmith also testified that the loss of heat probably was not caused by the change in transformers because the primary voltage at the power plant had been increased about the same time the change in transformers had been made; and that this increase would compensate for

any loss that would have resulted from use of the wye system and render it insignificant. His testimony in this respect was impeached by his later testimony that the voltage had been raised from 2,400 to 2,450 in 1948, and that under the 20:1 transformation ratio, such a raise would produce a difference of about only two and a half volts on the secondary or lighting circuit. Under the formula followed, such an increase would add only about five volts on the heat and power circuit involved herein. He admitted that this was the only increase in voltage made during his term as plant manager which covered the period material herein. While there is evidence that other improvements were made to increase the voltage, it does not appear conclusive that these improvements would render the change of voltage resulting from the new transformers insignificant.

Defendant contends that the court must accept as uncontradicted the fact that even under the delta system the hatchery never received more than 205 to 215 volts, and not 220 as the plaintiff alleges. It is true that the only evidence presented of actual voltage tests under the delta system indicated readings no higher than 215 volts. However, in view of the testimony that there is a wide fluctuation in voltage, and in view of other testimony that the delta system produced 220 to 230 volts, it is not unreasonable to assume that the readings described were taken when the voltage was at its lowest points, not representative of the normal voltage produced with the delta transformer.

Defendant's experts testified as to the difference in time required to heat the incubator to 99½ degrees with the 230-volt units as compared to the 208-volt elements. Their experiments showed that the incubator could be heated to the desired temperature with either unit in less than two hours. Defendant contends that this evidence impeaches that of Jensen and plaintiff to the effect that the units were operating much more of the time after the change in the transformer system. However, the experiments made by the experts were not under conditions identical to those of the normal course of business. It was conceded that when such experiments were made the vents were closed and that no eggs or trays, such as were normally used in the operation of the incubator, had been placed therein. It would follow that the testimony of the experts was not conclusive on this issue, and ac-

cordingly that a jury might consider that of both Jensen and plaintiff thereon.

In February 1953 plaintiff called Eldon Kobbervig, who was then manager of the power plant, to try to determine if something was wrong with the heating process in the incubators. Kobbervig explained to the plaintiff that the elements were rated for 220 volts, while the power system was rated at 208 volts. Plaintiff then had an electrician replace the two bottom elements in both incubators with ones rated for 208 volts. It was impossible to replace the top elements at that time because the incubators were in use. Plaintiff testified that he noticed an immediate improvement in the operation of the incubators after these changes had been made. The next season he replaced the remaining elements. He testified that after that it was "just like old times."

Damages were proved from records of plaintiff showing that, after the changes in the transformer in 1947, there was a decided drop in the percentage of eggs hatched as compared to prior years; and that, after discovery of the fault and its correction in 1953, the percentage of eggs hatched was approximately the same as for those years prior to 1947, when the transformers were changed. These records were analyzed by a certified public accountant, and his summary thereof, indicating such variations in percentages of hatchings, was submitted and received in evidence. It indicated the following:

| 1943 | 70.09 percent[1] |
|------|------------------|
| 1944 | ——————* |
| 1945 | 74.42 percent[1] |
| 1946 | ——————* |
| 1947 | ——————* |
| 1948 | ——————* |
| 1949 | 53.43 percent[2] |
| 1950 | 57.81 percent[2] |

[1]Computed from hatching records discovered shortly before trial. These percentages are essentially summaries of records showing the number of trays set, and, in most cases, the number of chicks hatched.

*Insufficient information to determine an average.

[2]Computed on the basis of records showing the number of trays set and records showing the number of sales of chicks.

| | |
|---|---|
| 1951 ........................................................... | 56.85 percent[3] |
| 1952 ........................................................... | 54.85 percent[3] |
| 1953 ........................................................... | 58.93 percent[3] |
| 1954 ........................................................... | 71.77 percent[4] |

There is a controversy over the admissibility of some of these records due to an alleged violation by plaintiff of a discovery order. Defendant had submitted interrogatories seeking information as to the percentages of hatches for the years 1943 through 1954. In an affidavit in response thereto, plaintiff affirmed that except for 1954 such information was not available in the form requested; that he did not keep records of each separate hatch; and that the information sought could be obtained only by computations from his other records, viz., records of eggs purchased, order sheets showing sales of hatched chicks, cash slips showing sales of hatched chicks, and various general business and financial records. The court ordered plaintiff to make the latter records available and to produce the records for 1954 for defendant's examination. All such records were kept in the office of plaintiff's attorneys in the same building as the office of defendant's attorneys and were available for inspection at all times. A short time before trial, plaintiff located other records, indicating settings for the years 1943 through 1945, from which records it was possible to compute the hatching percentages for such years. As soon as they were located, defendant's counsel was informed of them and invited to inspect them. At the trial when these records were offered in evidence, defendant moved for a continuance to permit further examination thereof, which motion was denied by the trial court. The latter, however, offered to order a later separate trial on the issue of damages, which

---

[3]Computed on the basis of records showing the number of eggs purchased and records showing the amount of sales of chicks.

[4]Compiled from fairly complete hatching records kept for that year. The accountant also compiled percentages for that year on the basis of purchase and sale records, the method used to compute percentages for the years 1949 to 1954. This was done for the purpose of checking the method used for those years. The figures were extremely close—71.55 percent as compared with 71.77 percent.

offer was declined by defendant.

Defendant contends that there are many variables which affect hatchings besides heat, so that any loss of heat due to changes in the transformers in 1947 would not necessarily indicate that plaintiff's loss was due thereto. Dr. Elton Johnson, Chairman of the Poultry Department of the University of Minnesota, an expert witness called by defendant, listed 19 factors which could affect hatchings. However, there is nothing to show any variations from year to year in any of such other factors that coincide with the decline and rise of the hatching percentages, and it seems clear that the jury might justifiably determine that the loss of heat due to the change in the transformer system, which was shown to have a direct relationship to the decline of hatching percentages, was the cause of plaintiff's loss.

■ Plaintiff and defendant stipulated that the agreement between them was an implied contract whereby defendant agreed to provide plaintiff with reasonably adequate and continuous electrical service and plaintiff agreed to pay established rates therefor. It has been held that such an implied agreement binds a supplier of power to furnish its customer the amount of electricity which, at the time of the contract, it knows will be required by the consumer, if, in the exercise of reasonable diligence under circumstances existing at the time of performance, it can do so without discrimination against its other customers. Humphreys v. Central Kentucky Natural Gas Co. 190 Ky. 733, 229 S. W. 117, 21 A. L. R. 664; Bromer v. Florida Power & Light Co. (Fla.) 45 So. (2d) 658, 13 A. L. R. (2d) 1227. Where it cannot do so without discriminating against its other customers, the contract will not be enforced. See, Kettle River Ry. Co. v. Eastern Ry. Co. 41 Minn. 461, 43 N. W. 469, 6 L. R. A. 111; Lone Star Gas Co. v. Municipal Gas Co. 117 Tex. 331, 3 S. W. (2d) 790, 58 A. L. R. 797, and Annotation.

■ In the instant case there is nothing in the record which would indicate that defendant's performance of the implied contract would result in discrimination against other consumers. Admittedly, the conversion to wye transformers was a reasonable one which defendant might determine was in the best interest of its consumers generally, and it would be improper, therefore, to require defendant to continue use

of the delta system merely for the benefit of plaintiff presumably to the detriment of other customers. However, it is clear from the record that defendant could have continued to supply adequate service to plaintiff, even while giving its other customers the benefit of the wye transformer system. Implicit in the verdict is a finding that, after plaintiff made a simple change of heating units in his incubators in 1953, the power supplied through the wye transformer system became adequate for the operation thereof, and accordingly that defendant could readily have continued to supply adequate power for plaintiff by providing new heating units for his incubators, or at least could have given him notice of the change from the delta to the wye transformer and thereby afforded him the opportunity of replacing such units. Under such facts, it cannot be said that defendant's performance of the contractual obligation above outlined would have worked a detriment to its other consumers so as to excuse it from performing the terms of its implied contract with plaintiff.

■ Defendant argues that the court erred in instructing that a supplier of power has a duty to furnish power sufficient "to meet the known needs" of its customers, contending that a supplier need only furnish power reasonably adequate and continuous to meet the general needs of the community and that, if this is done, the duty rests entirely upon the consumer to furnish equipment adapted to such a power supply. In support of this proposition, defendant relies upon State ex rel. W. J. Armstrong Co. v. City of Waseca, 122 Minn. 348, 142 N. W. 319, 46 L. R. A. (N. S.) 437. We think that case is distinguishable. There, the issue was whether a supplier of power was under a duty as a public utility to *enter* into such a contract as we have here. There was no issue relating to performance of such a contract such as is presented here. There, the holding was limited to a situation wherein a consumer with special machinery, which could not be operated by the normal power supply, sought to force a power company to furnish special equipment in order to obtain the needed power, and our holding was simply that the latter had the right to decline to enter into a contract with such requirements. Based upon Humphreys v. Central Kentucky Natural Gas Co. 190 Ky. 733, 229 S. W. 117, 21 A. L. R. 664; and Hiers v. South Carolina Power Co. 198 S. C. 280, 17

S. E. (2d) 698, we conclude that the instruction challenged correctly defined the principles applicable in the situation here presented, where there is nothing in the record which would in any way indicate that defendant could not meet the known requirements of plaintiff unless it discriminated against its other consumers.

■ Defendant contends that plaintiff's failure to give notice of his claim pursuant to M. S. A. 465.09 constitutes a bar to his recovery. This section requires that:

"Every person who claims damages from any city, village, or borough for or on account of any loss or injury sustained by reason of any defect in any bridge, street, sidewalk, road, park, ferry-boat, public works, or any grounds or places, *or by reason of the negligence of any of its officers, agents, servants, or employees,* shall cause to be presented to the common council or other governing body, within 30 days after the alleged loss or injury, a written notice, stating the time, place, and circumstances thereof, and the amount of compensation or other relief demanded. No action therefor shall be maintained unless such notice has been given; or if commenced within ten days thereafter, or more than one year after the occurrence of the loss or injury." (Italics supplied.)

According to our decisions, this section is applicable only to actions predicated on negligence. Bohrer v. Village of Inver Grove, 166 Minn. 336, 207 N. W. 721; H. Christiansen & Sons, Inc. v. City of Duluth, 225 Minn. 475, 31 N. W. (2d) 270. Here, the cause of action is predicated upon breach of an implied contract rather than upon negligence, and it would seem therefore that § 465.09 is without application.

It is true that, under some circumstances, it has been held that breach of an implied contract, such as this, will not give rise to an action for damages resulting from a power failure without proof of negligence. Suppliers of power, like common carriers, are excused from performance under implied contracts, if, as a result of an act of God or an inevitable accident performance becomes impossible. Curry v. Norwood Electric Light & Power Co. 125 Misc. 279, 211 N. Y. S. 441. In cases in which such an excuse for nonperformance is material, proof that the supplier was negligent and that the power failure was

not unavoidable is, of course, relevant and essential to a claim for relief. Bromer v. Florida Power & Light Co. (Fla.) 45 So. (2d) 658, 13 A. L. R. (2d) 1227. It would not follow that in all actions based upon breach of the implied contract between the supplier and consumer recovery must be dependent upon a showing of negligence. There is a clear distinction between cases wherein the supplier, through no fault of his, cannot perform the contract, and cases such as the instant one, wherein performance of the conditions of the implied contract was not impossible, and the failure therein was due solely to the voluntary acts of the supplier, wherein negligence played no part.

Further, neither the allegations nor the proof submitted here made negligence an element in plaintiff's action. Nowhere was it charged that the change in transformer systems was negligent or unreasonable. Nor can it be said that plaintiff's action rested upon defendant's negligent failure to give notice of such change. Had defendant given plaintiff notice thereof, such notice would not of necessity have absolved defendant from performance of the implied contract, although it might well have lessened the damages recoverable for its breach.

■ Defendant argues that recovery is barred by plaintiff's failure to file a claim pursuant to M. S. A. 412.271, which provides in part:

Subd. 1. "No disbursement of village funds, including funds of any municipal liquor dispensary operated by the village, shall be made except by an order drawn by the mayor and clerk upon the treasurer. Except when issued for the payment of judgments, salaries and wages previously fixed by the council or by statute, principal and interest on obligations, rent and other fixed charges, the exact amount of which has been previously determined by contract authorized by the council, and except as otherwise provided in subdivisions 4 and 5, no order shall be issued until the claim to which it relates has been audited and allowed by the council.

"Except for wages paid on an hourly or daily basis, where a claim for money due on goods or services furnished can be itemized in the ordinary course of business the person claiming payment, or his agent, shall prepare the claim in written items and sign a declaration that the claim is just and correct and that no part of it has been paid."

The purpose of the statute is to define the obligations resting upon

a municipal council as a board of audit. It was not intended to make such a council a tribunal for assessing damages. Manson v. Village of Chisholm, 142 Minn. 94, 170 N. W. 924. The exclusion of payments of judgments in subd. 1 of the statute and the limitation thereof to claims that can be itemized in the ordinary course of business are persuasive that the provisions of this section were not intended to apply to unliquidated claims for damages such as is involved in the instant case.

■ Defendant asserts the trial court erred in receiving in evidence plaintiff's records pertaining to hatches for the years 1943 and 1945, which plaintiff had failed to submit in response to defendant's demand for their inspection made October 11, 1954, pursuant to pretrial interrogatories submitted by defendant under Rule 31 of Rules of Civil Procedure. At the time plaintiff submitted his records in response to such interrogatories, it was his belief that these records of the 1943 and 1945 hatches were not in existence. Several days before trial, plaintiff learned the records requested for such years did exist and immediately offered them to defendant for inspection and examination. It is conceded that before trial defendant's counsel were given every opportunity of making a full examination of all of plaintiff's available records which were in the offices of plaintiff's counsel in the same building as were the offices of defendant's counsel. When plaintiff submitted the challenged records in evidence, defendant objected thereto because they had not been submitted in response to the pretrial interrogatories and moved for a continuance. The trial court thereupon offered to grant a separate trial on the issue of damages to which such record related, but defendant declined this suggestion. The trial court thereupon overruled the objection to the documents and they were received in evidence and the trial proceeded. Rule 37.02(2) of Rules of Civil Procedure provides that:

"If any party * * * refuses to obey an order made * * * under Rule 34 to produce any document or other thing for inspection * * * the court may make such orders in regard to the refusal as are just * * *."

Here, the record shows that plaintiff's failure to obey the order to produce these records was based upon his sincere belief that such records did not exist. Further, when they were discovered, they were promptly submitted to defendant for inspection. Under such circum-

stances, we do not feel that the trial court was compelled to refuse their reception in evidence or that it had abused its discretion in receiving them, particularly after its offer to order a separate trial on the issue of damages was declined.

■ Plaintiff testified he personally kept or supervised the keeping of all his records relative to hatchings for the years in question; and that all entries in the records submitted were made in the regular course of business and at or near the time of the transactions recorded. Based upon such foundation, his records, although disclosing erasures and corrections thereon, were received in evidence over defendant's objection as to the sufficiency of the foundation therefor, and as to their regularity. We feel that the trial court did not abuse its discretion in holding the foundation for the reception of this evidence sufficient. M. S. A. 600.02 specifies that:

"A record of an act * * * shall * * * be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act * * * and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission."

Thereunder, it is not required that every person who took part in the compilations of business records should testify as to their accuracy. The foundation for their reception in evidence is sufficient if one under whose supervision they are compiled testifies as to the preliminary proof specified under § 600.02. Brown v. St. Paul City Ry. Co. 241 Minn. 15, 62 N. W. (2d) 688, 44 A. L. R. (2d) 535; Cantrill v. American Mail Line, Ltd. 42 Wash. (2d) 590, 257 P. (2d) 179.

Here, although the records appear to be somewhat haphazard and disclose erasures and corrections, there is nothing to indicate that they are not trustworthy, and in general did not clearly record the transactions to which they related. As to small business concerns of this kind, if strict requirements were to be applied as to the keeping of their records, and as to the manner and method of making entries in connection with their business transactions, many would find their records inadmissible and their effort in attaining justice in litigation

thwarted. We have held that "The sufficiency of the preliminary proof to admit 'regular entries' is for the trial judge. It is a problem with respect to which his discretion is not narrowly limited." Tiedt v. Larson, 174 Minn. 558, 564, 219 N. W. 905, 907. With these principles in mind, we conclude that the reception of plaintiff's records in evidence did not constitute error.

Numerous other errors have been assigned. We have studied the record and the legal principles applicable to defendant's claims with respect thereto. To discuss each assignment separately would unduly prolong this opinion. We feel it sufficient to state that in our opinion none of such additional assignments discloses error sufficient to justify the granting of a new trial.

Affirmed.